In re SPAULDING COMPOSITES COM-
PANY, INC., a New Hampshire Cor-
poration, Debtor.

LIBERTY MUTUAL INSURANCE
COMPANY, Appellant,

v.

OFFICIAL UNSECURED CREDITORS'
COMMITTEE OF SPAULDING COM-
POSITES CO.; United States Trustee;
Appellees.

BAP No. CC–94–2174–RUMEJ.
Bankruptcy No. LA 93–16711 CA.
Adversary No. LA 94–02784 CA.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Oct. 23, 1996.

Decided Feb. 26, 1997.

Thomas W. Dressler, Dressler, Rein & Rayle, Los Angeles, CA, for Liberty Mut. Ins. Co.

Dolores Yarmoff–Nelson, Westlake Village, CA, for Official Committee of Unsecured Creditors.

Peter J. Herzberg, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Caldwell Trucking Co. Superfund PRP.

Before: RUSSELL[1], MEYERS, and JONES, Bankruptcy Judges.

## OPINION

DAVID E. RUSSELL, Bankruptcy Judge:

### OVERVIEW

The debtor filed a chapter 11 petition seeking protection from creditors alleging the debtor's liability for pollution remediation costs. After the filing, the debtor's insurer filed suit in state court to obtain a declaratory judgment of its liability to the debtor's corporate shareholders under insurance policies issued to both the debtor and these corporate affiliates. The unsecured creditors' committee then commenced an adversary proceeding claiming the insurer's state court action violated the automatic stay. The bankruptcy court issued a preliminary injunction prohibiting the insurer from further prosecuting the suit and later granted partial summary judgment in favor of the committee declaring the insurer's action void. The insurer appeals from the injunction and the judgment.

### FACTUAL BACKGROUND

On February 26, 1993, Spaulding Composites Company, Inc., ("Spaulding"), an industrial manufacturer, filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Central District of California.[2] Prior to

the filing, Spaulding operated facilities in Clifton, New Jersey and Tonawanda, New York. Spaulding allegedly generated hazardous wastes at these two facilities and both the New York Department of Environmental Conservation and the Environmental Protection Agency filed claims with the bankruptcy court seeking compensation for pollution remediation costs. In addition, an unincorporated association of potentially responsible parties, known as the Caldwell Trucking Superfund Site PRP Group (the "PRPs"), filed a third environmental claim against Spaulding (the "Caldwell Site" claim).

At its New Jersey facility, Spaulding contracted with Caldwell Trucking Company to remove hazardous waste, and Caldwell Trucking Company dumped the waste at the Caldwell Site. The PRPs are other companies who also contracted with Caldwell Trucking Company for waste disposal and now face joint and several liability with Spaulding for the costs of cleaning up the pollution at the Caldwell Site. They allege Spaulding is jointly liable for past and future cleanup expenses and seek contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675.

From 1977 to 1994, Appellant, Liberty Mutual Insurance Company ("Liberty"), issued at least twenty-five comprehensive general liability policies to Spaulding and Spaulding's corporate shareholders, Nortek, Inc. ("Nortek"), and Monogram Industries, Inc. ("Monogram"). Liberty is potentially liable to its insureds for any environmental claims falling within the scope of the insurance coverage. Liberty issued ten of these policies directly to Monogram and eight directly to Nortek. Spaulding is named as an additional insured on thirteen of these policies. Liberty issued the remaining seven policies directly to Spaulding.

On May 17, 1994, Liberty filed suit against Nortek and Monogram in the Supreme Court of the State of New York seeking declaratory

---

1. The Honorable David E. Russell, Chief Judge of the Eastern District Bankruptcy Court of California, sitting by designation.

2. Unless otherwise indicated, all references to "chapters", "sections", and " § " are to the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq.

relief to establish its liability under the insurance policies. The action named only Nortek and Monogram, and sought only a determination of Liberty's liability to Nortek and Monogram. However, many of the policies at issue either included Spaulding as an additional insured or named Spaulding as the sole insured. The complaint alleged that Nortek put Liberty on notice of potential claims on February 10, 1994, and that the notice triggered Liberty's concern and consequent lawsuit. Nortek and Monogram later removed the case to the United States District Court for the Western District of New York (the "New York" action).

On June 24, 1994, the Official Unsecured Creditors' Committee Of Spaulding Composites Company, Inc. (the "Committee") filed an adversary complaint on behalf of the estate against Liberty. Spaulding did not join the suit, but later filed a stipulation authorizing the Committee's representation of the estate. The adversary complaint sought a declaration that Liberty's New York action was void as a violation of the automatic stay. In addition it sought attorneys' fees and subordination of Liberty's unsecured claims for unpaid policy premiums. Shortly after filing the complaint, the Committee filed a motion seeking a preliminary injunction to enjoin any further prosecution of Liberty's New York suit until the court determined its propriety. Liberty Mutual responded with a motion to dismiss the complaint. At a hearing on August 1, 1994, the bankruptcy court issued a preliminary injunction which was to

last until August 29, 1994 (the date originally scheduled to hear Liberty's motion to dismiss). This hearing was subsequently continued to September 14, 1994, and the preliminary injunction order was not actually signed and filed until September 6, 1994.

On August 8, 1994, the Committee filed a motion for partial summary judgment. At the hearing on September 14, 1994, the bankruptcy court denied Liberty's motion to dismiss and granted partial summary judgment declaring the New York lawsuit void as a violation of the automatic stay. Liberty timely appealed.[3]

## ISSUES

Did the Committee have standing, on behalf of the estate, to pursue an adversary complaint against Liberty for violation of the automatic stay?

Is the appeal moot?

Did Liberty violate the automatic stay in the Spaulding case when it filed a lawsuit in state court against Nortek and Monogram?

## STANDARDS OF REVIEW

■ The question of standing to assert a violation of the automatic stay is a legal issue subject to de novo review. *In re Pecan Groves of Arizona*, 951 F.2d 242, 244 (9th Cir.1991); *In re Advanced Ribbons and Office Products, Inc.*, 125 B.R. 259, 262 (9th Cir. BAP 1991). Mootness is a jurisdictional issue which the court also reviews de novo. *In re Arnold & Baker Farms*, 85 F.3d 1415,

---

3. The parties have continued to pursue the environmental litigation. On July 25, 1994, the PRPs filed a complaint against Spaulding and its insurers in the United States District Court for the District of New Jersey. The complaint asked for a declaratory judgment of Spaulding's liability for the Caldwell Site cleanup and brought direct claims against the insurers, asserting authorization under both a settlement agreement with Spaulding and the New Jersey Spill Act. Spaulding cross-claimed against the insurers for defense and indemnification.

On July 17, 1995 the District Court of New Jersey dismissed the PRPs' direct claims against the insurers. The court also dismissed, without prejudice, Spaulding's cross-claims against the insurers because of policy prohibitions against joining the insurers in the same action where the insured's liability would be determined. However, the court expressly held that Spaulding was

entitled to bring a separate action against the insurers, and, the next day, Spaulding filed suit in New Jersey Superior Court naming all of its insurers.

On August 22, 1995, Liberty filed a new declaratory action in New York state court, naming Nortek, Monogram, and Spaulding. It also filed a motion in the New Jersey Superior Court seeking to dismiss Spaulding's suit on the grounds of *forum non conveniens*. On January 5, 1996, the New Jersey Superior Court denied Liberty's motion.

On April 22, 1996, the District Court of New Jersey granted the PRPs' motion for summary judgment declaring Spaulding liable under CERCLA for response costs at the Caldwell Site.

On September 6, 1996, the New York state court dismissed Liberty's suit, deferring to the suit in the New Jersey Superior Court.

1419 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997); *In re Baker & Drake Inc.*, 35 F.3d 1348, 1351 (9th Cir.1994). The scope of the automatic stay is a legal issue subject to de novo review. *In re Del Mission Ltd.*, 98 F.3d 1147, 1150 (9th Cir.1996); *In re Bibo, Inc.*, 200 B.R. 348, 350 (9th Cir. BAP 1996).

## DISCUSSION

### A. STANDING

■ As a threshold matter, Liberty challenges the Committee's standing to prosecute violations of Spaulding's automatic stay. Liberty contends that a cause of action premised on § 362 may be maintained only by the trustee or debtor-in-possession, citing to *In re Pecan Groves*, 951 F.2d 242, 245 (9th Cir.1991), and *In re Brooks*, 79 B.R. 479, 481 (9th Cir. BAP 1987), *aff'd on other grounds*, 871 F.2d 89 (9th Cir.1989). *See also Matter of Pointer*, 952 F.2d 82, 87 (5th Cir.1992)(creditor lacks standing to use § 549 to avoid lien obtained in violation of § 362(a)); *Matter of Vitreous Steel Products*, 911 F.2d 1223, 1231 (7th Cir.1990) (unsecured creditor has no standing to challenge, in its own name, an order granting relief from stay); *In re American Ready Mix, Inc.*, 14 F.3d 1497, 1501 (10th Cir.1994)(unsecured

creditor has no standing to appeal an order of the bankruptcy court lifting the automatic stay). Whether a creditor has direct standing under § 362 poses an interesting question,[4] but we need not address the issue in this case. The Committee filed suit, not in its own right, but on behalf of the estate. Consequently, it asserts derivative standing. Derivative standing poses distinct considerations.

■ It is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation. *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247–52 n. 19 (5th Cir. 1988)(and cases cited therein); *In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir.1985); *In re Curry and Sorensen, Inc.*, 57 B.R. 824, 827–29 (9th Cir. BAP 1986). In *Curry*, the panel held that a creditor dissatisfied with the lack of action on the part of the debtor-in-possession may petition the court to compel the debtor-in-possession to act or gain court permission to institute the action itself. *Id.* at 828. However, the panel held that the creditor must receive court approval **before** instituting the proceeding and the action must be brought in the name of the bankruptcy estate as the real party in interest.[5] *Id.* at 828–29.

---

**4.** The Ninth Circuit, in a decision subsequent to *Pecan Groves* and *Brooks*, held that actions taken in violation of the stay are void, not merely voidable. *In re Schwartz*, 954 F.2d 569, 571 (9th Cir.1992). It would seem that invocation of one of the avoidance powers (powers vested in the trustee) is no longer required to undo a transfer in violation of the stay. In other words, § 362 by itself arguably gives a creditor direct standing.

In a similar vein, the case at bar was filed under chapter 11 (as opposed to chapter 7) and involves an unsecured creditors' committee (as opposed to an individual creditor), warranting an analysis of statutory standing under code sections 1109(b) and 1103(c)(5), respectively. *See e.g. Matter of Pointer*, 952 F.2d at 85–89 (engaging in constitutional, prudential, and statutory standing analysis); *Matter of Ring*, 178 B.R. 570 (Bankr.S.D.Ga.1995)(same, reviewing Ninth Circuit authority); *Matter of James Wilson Associates*, 965 F.2d 160, 168–170 (7th Cir.1992).

And finally, the Ninth Circuit itself, in *In re Goodman*, 991 F.2d 613, 620 (9th Cir.1993), has granted a creditor standing to seek damages for willful violations of the stay pursuant to the bankruptcy court's civil contempt powers, a case that would need to be reconciled to *Pecan Groves*

before we could adopt the blanket rule Liberty suggests. *See also Id.* at 618–620 (§ 362(h) creates standing for an "individual" creditor to seek damages for another creditor's willful violation of the stay); *Matter of Vitreous Steel Products* 911 F.2d at 1231 (creditor has standing to seek equitable subordination under § 510(c) for another creditor's violation of stay). We express no view on these matters.

**5.** The caption to the adversary complaint failed to name the Spaulding estate. We think naming the estate in the caption is the better practice, but it is not cause to dismiss. In the first paragraph of the complaint, the Committee clearly stated that the action was filed on behalf of the estate. Federal Rule of Civil Procedure 17(a), applicable in adversary proceedings by virtue of Bankruptcy Rule 7017, states that no action shall be dismissed on the grounds that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed for ratification by the real party in interest. Here, Spaulding ratified the Committee's complaint when it stipulated to its consent. See Fed. R.Civ.P. 17(a)(ratification shall have the same

### 1. Stipulated Representation

■ This case is somewhat unusual in that the setting for derivative litigation often involves a debtor-in-possession ("DIP") who is hostile to proposed litigation. *See e.g., Curry*, 57 B.R. at 828; *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d at 247; *In re STN Enterprises*, 779 F.2d at 901. In that setting, the concern is that the DIP is failing to attend to litigation which it **should** pursue. Here, however, rather than opposing the Committee's suit, Spaulding approved of it, and Liberty argues the converse to the above—that is, Liberty argues that the Committee is fostering estate litigation which **should not** be pursued. The question, then, is whether a DIP may stipulate to representation by an unsecured creditors' committee. We hold that it may.

■ Liberty points out that Nortek, its opponent in the New York action, also cochairs the Unsecured Creditors Committee. Liberty claims that Nortek, to gain an advantage in the New York suit, has convinced the Committee to appropriate and pursue an automatic stay claim belonging to Spaulding's estate.[6] Liberty's concerns warrant pause, but its proposed rule—a flat prohibition against any surrogate representation—not only conflicts with accepted practice, it also fails to recognize the potential benefits of allowing an unsecured creditors' committee to conduct estate litigation. The DIP has an obligation to pursue all actions that are in the best interests of creditors and the estate. *Curry*, 57 B.R. at 828. An unsecured creditors' committee has a close identity of interests with the DIP in this regard. Allowing the DIP to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the DIP to manage the estate and fulfill its duties. Here, for example, Spaulding was able to concentrate its resources on rehabilitating the business while the Committee prosecuted the adversary complaint. Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate. So long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial, allowing a creditors' committee to represent the estate presents no undue concerns. *See Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1362–63 (5th Cir.1986)(debtor-in-possession's stipulation effective to confer standing on unsecured creditors' committee).

### 2. Retroactive Authorization

■ Liberty also points out that the Committee failed to secure the bankruptcy court's approval before filing the complaint. As stated above, *Curry* held that a creditor must seek the court's consent in advance. *Id.* at 828. Other circuits have imposed this same requirement. *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d at 247; *Matter of Pointer*, 952 F.2d 82, 88 (5th Cir.1992). But the significant fact here is that the Committee did, eventually, seek the bankruptcy court's permission to represent the estate and to continue prosecution of the suit. The court, exercising its judicial oversight, found that the Committee was an appropriate plaintiff. Additionally, the court entertained Liberty's objections to the Committee's representation at a lengthy hearing.

effect as if the action had originally been commenced in the name of the real party in interest).

**6.** The parties to this appeal accuse each other of improper forum shopping. New York courts purportedly interpret the "pollution exclusion clause" differently than New Jersey courts. *Compare. e.g., Powers Chemco, Inc. v. Federal Ins. Co.*, 74 N.Y.2d 910, 548 N.E.2d 1301, 549 N.Y.S.2d 650 (1989) and *Technicon Electronics Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989)(both applying New York law) *with Morton Int'l. Inc. v. General Acc. Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993) (applying New Jersey law).

Apparently, Liberty might lay claim to "first-to-file" status to obtain a New York forum. The "first-to-file" rule is an aspect of the doctrine of comity. It holds that when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and the other court should abstain. *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir.1982).

We need not, and do not, express any opinion on New York or New Jersey insurance law, the "first-to-file" rule and Liberty's putative first-to-file status, or the parties' allegations of forum shopping.

As stated in *Curry*, it is this "judicial intervention [that] is crucial." *Curry*, 57 B.R. at 828. While the better practice is for the plaintiff to secure approval before filing the complaint, we will not foreclose the ability of a court to make its approval of the representation retroactive to the time of the filing. To hold otherwise would generate needless dismissals and refilings. *See. e.g., In re Cat-wil Corp.*, 175 B.R. 362, 365 (Bankr.E.D.Cal. 1994) (approving the unsecured creditors' committee application for retroactive authorization to prosecute actions on behalf of debtor); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1398 (5th Cir.1987)(refusing to force creditors' committee to go through "empty, formalistic ritual" of refiling complaint when approval of standing foreordained).

## B. MOOTNESS

 The Committee also presents a threshold attack, arguing that the Panel should reject Liberty's appeal altogether on the grounds of mootness. In *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1351 (9th Cir.1994) (citations omitted), the court stated that "[w]e also dismiss an appeal as moot if a party opposing a reorganization plan has failed to obtain a stay pending appeal, and the plan has been carried out to 'substantial culmination.'" However, failure to obtain a stay is not fatal in every case; it is not always impossible to grant relief simply because the plan has been consummated nor is it always impossible to undo a plan. Rather, "whether to unscramble the eggs turns on what is practical and equitable." *Id.* at 1352. *See also In re Arnold & Baker Farms*, 85 F.3d 1415, 1419 (9th Cir.1996), *cert. denied*, ——— U.S. ———, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997) (appeal not moot if bankruptcy court can fashion effective relief on remand).

The Committee notes, and Liberty does not dispute, that the Plan has been substantially consummated: administrative and priority claims have been paid in cash; restructured notes have been executed and delivered; proceeds from the sale of equipment have been distributed; and the reorganized debtor has been vested with all of the debtor's property not otherwise transferred. The Committee also argues that the PRPs, the EPA, and Spaulding all settled the environmental claims on the premise that the insurance litigation would occur in New Jersey. If Liberty prevails in this appeal, the Committee fears the entire settlement could be at risk.

Those fears are unfounded. This appeal only addresses the bankruptcy court's order voiding Liberty's New York action. If reversed, Liberty could then proceed with the suit against Nortek and Monogram. This remedy, if warranted, has no implications for the Plan of Reorganization: it would not require a retraction of any payments or proceeds distributed to creditors; the debtor could continue to manage the rehabilitated business; and all the parties to the settlement agreement would still be bound by it. As for the Committee's claim that the parties expected to litigate in New Jersey, they cannot argue they relied on the invalidation of the New York action when entering the settlement or voting on the Plan since the court approved both the Plan and the settlement **before** resolving the status of Liberty's New York action. But, more importantly, granting Liberty the relief it requests would not require the EPA, PRPs, or Spaulding to litigate in New York—only Nortek, Monogram, and Liberty are parties to that suit. In short, plan consummation is no bar to relief in this case.

 Alternatively, the Committee contends that Liberty's own actions render the appeal moot. After filing this appeal, Liberty initiated a new New York action naming Nortek, Monogram, and Spaulding as defendants, and the Committee reasons that Liberty already has its New York forum. Again, the Committee's argument is unpersuasive. The bankruptcy court voided Liberty's first New York action against Nortek and Monogram, rendering it a nullity. Liberty notes that, although it has filed a new suit, the date of filing may be a relevant factor in venue selection, and the bankruptcy court's order voiding Liberty's original suit terminated Liberty's first-to-file status against Nortek and Monogram. *See All-trade, Inc. v. Uniweld Products, Inc.*, 946

F.2d 622, 625 (9th Cir.1991); *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir.1982). If the bankruptcy court erred, then, according to Liberty, the court's order impinged upon a potentially cognizable interest.

We are inclined to agree, but need not rest our conclusion on the effect upon Liberty's asserted first-to-file status. In the court below, the Committee continues to press claims against Liberty for attorneys' fees and for subordination of Liberty's unsecured claims. It premises these claims on Liberty's alleged violation of the stay. Given that those claims will stand or fall depending upon the panel's decision, the outcome of this appeal will have a very real effect on the proceedings below. The appeal is not moot.

## C. THE AUTOMATIC STAY

■ Turning to the merits, the central issue is whether Liberty's New York lawsuit—naming only Nortek and Monogram—violated the automatic stay imposed in the Spaulding case. Section 362(a)(3) states:

(a) Except as provided in subsection (b) of this section, a petition filed ... operates as a stay, applicable to all entities, of—

. . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

11 U.S.C. § 362.

### 1. "Property Of The Estate"

Several cases have held that a debtor's insurance policies are property of the estate. *See In re Minoco Group Of Companies, Ltd.*, 799 F.2d 517, 519 (9th Cir.1986); *Matter of Vitek, Inc.*, 51 F.3d 530, 533 (5th Cir. 1995)(and cases cited therein). In *Minoco*, the debtor owned director and officer ("D & O") liability policies, and, after the debtor filed its bankruptcy petition, the insurance

company gave notice that it intended to cancel the policies. The insurance company argued that the policies were not property of the estate because the coverage only benefited the directors and officers. The Ninth Circuit disagreed. The bankruptcy court had made a factual finding that the policies also benefited the debtor in that they insured the debtor against any claims the directors or officers might levy directly against it. Canceling the insurance policies would extinguish the debtor's right to this indemnification. Consequently, the Ninth Circuit ruled that the policies represented property of the estate and cancellation was automatically stayed. *Id.* at 519 & n. 2.

In *Minoco*, the insurer unambiguously sought to extinguish the debtor's **own right** to insurance coverage. In the case at bar, however, Liberty makes no threat to Spaulding's insurance coverage. Although Spaulding claims an interest in many of the policies, Nortek and Monogram also claim coverage under those policies. That two separate property interests might exist in a single policy was a point recognized by the Fifth Circuit:

On one extreme, when a debtor corporation owns a liability policy that *exclusively* covers its directors and officers, we know from *Louisiana World Exposition* [832 F.2d 1391 (5th Cir.1987)] that the proceeds of that D & O policy are not part of the debtor's bankruptcy estate.[7] On the other extreme, when a debtor corporation owns an insurance policy that covers its own liability *vis-a-vis* third parties, we—like almost all other courts that have considered the issue—declare or at least imply that both the policy *and the proceeds* of that policy are property of the debtor's bankruptcy estate.[8] But we have not yet grappled with how to treat the proceeds of a liability policy when (1) the policy-owning debtor is but one of two or more coin-

---

**7.** The policy described here is analogous to the contractor's surety bond at issue in *Matter of Lockard*, 884 F.2d 1171 (9th Cir.1989). In that case, the debtor obtained a contractor's license bond running to the benefit of a third party. After the debtor filed for bankruptcy, the third party sued the surety directly. The Ninth Circuit held that the surety bond was not "property of

the estate" within the meaning of § 541, even though the action against the surety would have a significant, albeit indirect, impact on the estate and unsecured creditors. *Id.* at 1178 n. 12.

**8.** The policy described here is analogous to the policy at issue in *Minoco*, 799 F.2d at 519.

sureds or additional named insureds, (2) the rights of the other coinsured(s) or additional named insured(s) are *not* merely derivative of the rights of one primary named insured, and (3) the aggregate potential liability substantially exceeds the aggregate limits of available insurance coverage.

*Matter of Vitek, Inc.*, 51 F.3d at 535 (citations omitted) (emphasis in original).

Here, Nortek and Monogram are both coinsured with the debtor. Additionally, their property rights are not merely derivative of Spaulding's rights; Nortek and Monogram assert their own, independent rights to coverage. Liberty meticulously circumscribed the scope of the New York suit to include only non-debtors and to place at issue only non-debtor property interests. True, Spaulding asserts an interest in the policies, but, as the Seventh Circuit has stated; a "debtor's interest in a portion of property does not subject the entire property to § 541. Nor does a debtor's claim to property mean that the entire property is a part of the bankruptcy estate." *Matter of Carousel Int'l. Corp.*, 89 F.3d 359, 362 (7th Cir.1996) (citations omitted).

The Committee seeks to avoid this bifurcation and argues that the bankruptcy estate includes both its own and the Nortek/Monogram interests. The Committee cites to *In re Pintlar Corp.*, 175 B.R. 379 (Bankr.D.Idaho 1994). In *Pintlar,* the bankruptcy court held that § 362(a) stayed a declaratory judgment action brought against the debtor's former directors by an insurance company under the debtor's D & O policies. The court reasoned that any benefits paid to directors and officers would increase the debtor's liability exposure. *Id.* at 385. *See also Minoco*, 799 F.2d at 519 n. 2. In this case, however, the Committee failed to establish that predicate fact in the court below; nothing in the record indicates fulfilling the duty owed to Nortek or Monogram would impair Liberty's ability to satisfy its obligations to Spaulding or increase Spaulding's liability exposure.

Additionally, the court in *Pintlar* relied on *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 999 (4th Cir.1986). The Ninth Circuit has declined to endorse the *A.H. Robins* holding on several occasions and recently stated that *A.H. Robins* and the other "unusual circumstances" cases, "although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate." *In re Chugach Forest Products, Inc.*, 23 F.3d 241, 247 n. 6 (9th Cir.1994) (quoting *Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir.1993)). Here, the bankruptcy court did not rely upon its injunctive power; it found Liberty's suit threatened estate property. We do not agree. Such an expansive definition of estate property would have the effect of bringing into the bankruptcy court litigation that is properly situated outside of it.

**2. "Exercise Control Over"**

 Even assuming Liberty's suit involved property of the estate, Liberty merely made mention of the debtor's insurance policies; for the action to fall within the automatic stay, Liberty must have also attempted to "exercise control" over the estate's property.[9] The Ninth Circuit, in *In re Bialac,* 712 F.2d 426 (9th Cir.1983), applied a three part test to determine whether a creditor violated § 362(a)(3). First, the court examined whether the debtor had a property right at state law. Second, the court asked whether that right was property of the estate. Third, the court determined "if the property was altered in a manner contrary to the relevant provisions of 11 U.S.C. § 362(a)...." *Id.* at 429–430 (9th Cir.1983). *See also In re Bibo, Inc.,* 200 B.R. 348, 351 (9th Cir. BAP 1996).

This case falters on the third prong. As discussed above, Liberty narrowly crafted the New York lawsuit. It named only Nor-

---

9. The "exercise control" clause of § 362(a)(3) was added to the bankruptcy code by amendment in 1984. Pub.L. No. 98–353, *reprinted in* 1984 U.S.C.C.A.N. (98 Stat.) 371. Congress did not provide an explanation for the new language. *In re Del Mission Ltd.,* 98 F.3d 1147, 1151 (9th Cir.1996).

tek and Monogram (both non-debtors) and the suit sought solely to determine Nortek's and Monogram's rights to insurance coverage. Even if it is assumed Liberty's New York action included property interests of the estate, the suit asked only for a **declaration** of its liability to two **non-debtors.** We fail to see how such an action amounts to an "exercise of control over the property of the estate." 11 U.S.C. 362(a)(3).

We find support for this conclusion in several cases reconciling interpleader actions to the automatic stay. They hold that "the right to pursue an interpleader action is not affected by the fact that one of the claimants has filed a petition in bankruptcy." *Price & Pierce Int'l. v. Spicers Int'l. Paper Sales, Inc.,* 50 B.R. 25, 26 (S.D.N.Y.1985); *See also Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 996 (5th Cir.1985) (interpleader action does not seek to obtain property of the estate as proscribed by § 362(a)(3)); *Rett White Motor Sales Co. v. Wells Fargo Bank,* 99 B.R. 12, 14 (N.D.Cal.1989)(neither interpleader relief nor declaratory relief are actions to exercise control over property of debtor's estate); *cf. Bigelow v. C.I.R.,* 65 F.3d 127, 129 (9th Cir.1995)(action to determine whether estate property in fact exists does not violate stay); *Corso v. DeWitt,* 180 B.R. 589, 592 (C.D.Cal. 1994) (maritime limitation action does not violate § 362(a)(3)). The rationale for this rule is based upon the defensive nature of the suit: the nominal plaintiff in an interpleader is, in actuality, defending against multiple claims to the property, one of the claimants being the debtor. *Price & Pierce Int'l,* 50 B.R. at 26; *Corso v. DeWitt,* 180 B.R. at 592; *cf. In re Merrick,* 175 B.R. 333, 334 (9th Cir. BAP 1994) (defense issues not affected by automatic stay). Liberty's New York action is also defensive in nature. Liberty seeks a declaration of its responsibilities to a claimant to an insurance policy. But more significantly, Liberty abstained from including the debtor. A *fortiori,* if an interpleader action which names the debtor falls outside of the stay, Liberty's suit, which leaves the debtor out of the suit altogether, also falls outside the automatic stay.

Moreover, this holding properly reflects the purpose of the automatic stay. Congress intended § 362(a)(3) to prevent dismemberment of the estate and to enable an orderly distribution of property, *In re Chugach Forest Products, Inc.,* 23 F.3d at 245, but nothing in Liberty's New York suit will have any effect on Spaulding's estate or on Spaulding's creditors. On the contrary, the bankruptcy court's order had the effect of extending the stay beyond the domain of bankruptcy to a suit between non-debtors. As the Ninth Circuit has stated: "while seemingly broad in scope, the automatic stay provisions should be construed no more expansively than is necessary to effectuate Legislative purpose." *Id.* at 245. No bankruptcy purpose is served by letting Nortek and Monogram use Spaulding's automatic stay as a tool to halt litigation which leaves the debtor and estate property untouched. *See also U.S. v. Inslaw, Inc.,* 932 F.2d 1467, 1473 (D.C.Cir.1991) (the purpose of the automatic stay does not require that every party who acts in resistance to the debtor's view of its rights violates § 362(a)); *In re Edgins,* 36 B.R. 480, 484 (9th Cir. BAP 1984) (shield of § 362 should not be used as a sword to divest other parties of legitimate interests in property).

## D. THE PRELIMINARY INJUNCTION

In the Amended Notice of Appeal, and in its appellate brief, Liberty refers to a permanent injunction. We have searched the record and can find neither an oral nor written order to that effect. The only injunctive order is the Order On Motion For Preliminary Injunction. That document by its terms and in the context in which it was prepared and signed was intended to be of limited duration, namely until the court could hear and determine whether the New York action violated the stay.

After the Committee filed its adversary complaint, it filed a motion seeking a preliminary injunction. At a hearing on August 1, 1994, the bankruptcy court orally granted the motion, but only until August 29, 1994 (the date scheduled for hearing Liberty's motion to dismiss). However, the August 29 hearing was continued to September 14. Since counsel prepared the preliminary injunction order

with the expectation that it would only continue to August 29, the bankruptcy judge had to strike the month and day when he signed the order on September 6. The signed order thus reads that the injunction shall continue until "_____ __, 1994." As written, the order is, perhaps, ambiguous. But, in context, it is clear that the bankruptcy court simply granted a preliminary injunction until the date on which it could hear the summary judgment motion.[10] At that hearing, the bankruptcy court stated that Liberty's New York action was void as a violation of the automatic stay and the court's written order is to the same effect. The preliminary injunction order has long since expired by its own terms rendering Liberty's challenge to it moot.

## CONCLUSION

Liberty's New York lawsuit against Nortek and Monogram did not violate Spaulding's automatic stay. The bankruptcy court's partial summary judgment in favor of the Committee declaring Liberty's New York lawsuit void is reversed.

---

10. The transcript of the hearing on August 1, 1994 reads:
THE COURT: ... I think there's irreparable harm to the debtor and I'm going to hear the matter in a very short time on the motion itself, on the complaint itself. Like within about ten or fifteen days.

MR. DRESSLER: There's a motion to dismiss set for the 29th of August.
THE COURT: Well, we'll hear it that day.
MR. DRESSLER: Are you granting preliminary injunction through the 29th?
THE COURT: Only to the 29th.