### In re VALLEY PARK, INC., Debtor.

### Bankruptcy No. 97–12587–11.

United States Bankruptcy Court,
D. Montana.

March 17, 1998.

Gregory Paskell, Kalispell, MT, for Debtor.

James A. Patten, West, Patten, Bekkedahl & Green, P.L.L.C., Billings, MT, for Unsecured Creditor's Committee.

Steven M. Johnson, Church, Harris, Johnson & Williams, Great Falls, MT, for BRH Associates, Inc.

### ORDER

JOHN L. PETERSON, Chief Judge.

In this Chapter 11 bankruptcy case the Unsecured Creditors' Committee ("UCC") filed a motion for authority to avoid transfers based upon 11 U.S.C. § 1103(c)(5)[1] on January 23, 1998. After due notice a hearing on the UCC's motion was held at Billings on March 3, 1998. The Debtor–in–Possession ("DIP") filed a consent to the UCC's motion, after first filing a response in opposition on February 27, 1998, and was represented at the hearing. The UCC was represented at the hearing by counsel in support of its motion. BRH Associates, Inc. ("BRH"), an alleged recipient of certain prepetition transfers from the DIP, filed an objection and brief opposing the UCC's motion and was represented by counsel in opposition. Marvin Bethea ("Bethea"), chairman of the UCC, testified in support of the UCC's motion. Exhibits 2 and 4 were admitted into evidence. Exhibit 3 was refused. At the close of the hearing the Court allowed the UCC time to file a reply brief, and took the matter under advisement. The UCC's reply having been filed and reviewed by the Court, this matter is ripe for decision. The UCC's motion is granted.

### I. CONTENTIONS OF THE PARTIES

The UCC's motion seeks authority to commence proceedings to avoid fraudulent transfers of property from the DIP to the St. Marie Trust, the AES Trust, Valley Park Enterprises Trust, BRH, and Taylor. The UCC contends that members of the family of Terry Parks, president of the DIP, are beneficiaries of the above named trusts and entities who benefitted from the transfers. As such, the UCC asserts the transfers are avoidable by the UCC under the test set forth at *Canadian Pacific Forest Products Limited v. J.D. Irving, Limited (In re the Gibson ·Group, Inc.)* ("*Gibson*"), 66 F.3d 1436, 1444–45 (6th Cir.1995).

BRH opposes the UCC's motion, contending that the UCC has no standing to bring avoidance actions, that the UCC has shown no colorable claim, has not shown an unjustified refusal by the DIP to bring avoidance actions, has not shown any actual unsecured creditors at the time of the transfers, and relies for its theory on constructive fraud which, BRH asserts, is barred under 11 U.S.C. § 544(b)[2] the holding of *Kupetz v. Wolf,* 845 F.2d 842, 847, 849 (9th Cir.1988).

### II. FACTS

Exhibits 2 and 4 show several hundred transfers of residential units, deeds of trust and other interests between the DIP and St. Marie Trust, Valley Park Enterprises Trust, and BRH beginning April 5, 1996, through September 25, 1997, which is the day before the DIP filed this Chapter 11 petition. Bethea, who was employed by the DIP before this bankruptcy case, testified that Terry Parks controls the AES Trust. BRH did not cross examine Bethea, and did not offer any witness testimony or exhibits which controverted Bethea's testimony or Exhibits 2 and

---

1. Section 1103(c)(5) provides: "(c) A committee appointed under section 1102 of this title may— ... (5) perform such other services as are in the interest of those represented."

2. Section 544(b) provides: "The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

4. In fact, BRH admits in its brief to acquiring 600 apartment units.

Of the consideration for the transfers shown in Exhibit 2, for example, the DIP transferred 720 residential units and other commercial property to St. Marie Trust in return for $560,000 in cash, debt payoffs and other unnamed values on April 5, 1996. The stated purpose of the transfer was "To close deal—Protect assets—Raise capital". Of the $560,000 and other consideration, Bethea testified that all was applied to pay off a credit union and for taxes, leaving nothing for the DIP's estate. BRH argues in its brief that BRH paid "nearly $2.0 million" for the 600 apartment units it acquired, but offered no evidence in the record to support a finding of $2.0 million consideration. Argument of counsel is not evidence.

The DIP's Statement of Financial Affairs shows twenty-six transfers from the DIP to Terry Parks beginning October 29, 1996, and ending October 31, 1997. There is no evidence in the record of consideration given by Parks in return for such transfers, or for other transfers shown in the Statements.

### III. DISCUSSION

■ The parties dispute the considerations set forth in the holding of *Gibson.* There, the Sixth Circuit held that a "creditor's committee may have derivative standing to initiate an avoidance action where: 1) a demand has been made upon the statutorily authorized party to take action: 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court, and 4) the inaction is an abuse of discretion ('unjustified') in light of the debtor-in-possession's duties in a Chapter 11 case. A creditor has met its burden to show standing to file an avoidance action if it has fulfilled the first three requirements and the trustee or debtor-in-possession declined to take action without stating a reason." 66 F.3d at 1446.

BRH first flatly contends that *In re Commercial Western Finance Corp.,* 761 F.2d 1329, 1337–38 (9th Cir.1985) "specifically held that the trustee's avoidance powers cannot be exercised by creditors." Upon review of *In re Commercial Western Finance Corp.,* this Court must observe that the case simply does not stand for the proposition for which BRH cites it [3]. The conclusions reached by the Ninth Circuit in *In re Commercial Western Finance Corp.* were simply that the trustee could not utilize motion practice in lieu of adversary proceedings to exercise strong-arm powers to avoid security interests pursuant to § 544, and that the trustee could not classify creditors all in the same class unless they were substantially similar under 11 U.S.C. § 1122(a). 761 F.2d at 1337–38. These conclusions, and the Ninth Circuit's discussion of the investors' standing to appeal earlier in the opinion, 761 F.2d at 1336–37, do not support BRH's standing argument.

On the contrary, the Ninth Circuit's lenient standard is set forth at *In re Spaulding Composites Co., Inc.,* 207 B.R. 899, 903–04 (9th Cir. BAP 1997), which provides:

It is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation. *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 247–52 n. 19 (5th Cir.1988)(and cases cited therein); *In re STN Enterprises,* 779 F.2d 901, 904 (2d Cir.1985); *In re Curry and Sorensen, Inc.,* 57 B.R. 824, 827–29 (9th Cir. BAP 1986). In *Curry,* the panel held that a creditor dissatisfied with the lack of action on the part of the debtor-in-possession may petition the court to compel the debtor-in-possession to act or gain court permission to institute the action itself. *Id.* at 828.

\* \* \* \* \* \*

This case is somewhat unusual in that the setting for the derivative litigation often involves a debtor-in-possession ("DIP")

---

**3.** It is bad enough for BRH to cite a case for a proposition it does not stand for. The error is compounded when counsel asserts "The Ninth Circuit has specifically held that the trustee's avoidance powers cannot be exercised by creditors" in *In re Commercial Western Finance Corp.,* when the case states nothing of the kind, specifically or otherwise.

who is hostile to proposed litigation. *See e.g., Curry,* 57 B.R. at 828; *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d at 247; *In re STN Enterprises,* 779 F.2d at 901. In that setting, the concern is that the DIP is failing to attend to litigation which it should pursue. Here, however, rather than opposing the Committee's suit, Spaulding approved of it, and Liberty argues the converse to the above-that is, Liberty argues that the Committee is fostering estate litigation which should not be pursued. The question, then, is whether a DIP may stipulate to representation by an unsecured creditors' committee. We hold that it may.

\*    \*    \*    \*    \*    \*

The DIP has an obligation to pursue all actions that are in the best interests of creditors and the estate. *Curry,* 57 B.R. at 828. An unsecured creditors' committee has a close identity of interests with the DIP in this regard. Allowing the DIP to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the DIP to manage the estate and fulfill its duties. Here, for example, Spaulding was able to concentrate its resources on rehabilitating the business while the Committee prosecuted the adversary complaint. Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate. So long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial, allowing a creditors' committee to represent the estate presents no undue concerns. *See Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1362–63 (5th Cir.1986)(debtor-in-possession's stipulation effective to confer standing on unsecured creditors' committee).

*See also, In re Conley,* 159 B.R. 323, 324 (Bankr.D.Idaho 1993) (*construing* 11 U.S.C. §§ 547, 548 & 1123(b)(3)).

The instant case presents facts similar to *In re Spalding Composites Co., Inc.* The DIP has consented to an Order granting the UCC's motion for authority to pursue avoidance actions. This consent, coupled with Terry Parks' obvious reluctance, as DIP's president, to initiate avoidance proceedings against himself and trust entities of which he and his family are beneficiaries, obviates the need for strict application of the first, second, and fourth considerations from *Gibson, supra,* 66 F.3d at 1446.

BRH contends that the UCC has shown no colorable claim on several grounds, including the absence of actual unsecured creditors at the time of the transfers, no failure of consideration, and the unavailability of the theory of constructive fraud under the holding of *Kupetz v. Wolf.* The Court finds that none of these grounds are sufficient to deny the UCC's motion.

The Court finds that, for purposes of UCC's motion, it has shown a colorable claim exists that would benefit the estate if successful. Exhibits 2 and 4 show hundreds of residential units transferred from the DIP prepetition to entities controlled by the president of the DIP, and whose beneficiaries are members of Parks' family, and eventually to BRH. The exhibits and Bethea's uncontroverted testimony show that the transfers may have been for inadequate consideration. BRH's contentions that they paid $2.0 million have no support in the record.

It is unrealistic to expect that Terry Parks, as president of the DIP, would initiate and vigorously pursue avoidance actions against himself and trust entities of which he and his family are beneficiaries. Nonetheless, DIP's obligation to pursue such avoidance actions which are in the best interests of creditors and the estate is clear. *In re Spaulding Composites Co., Inc.,* 207 B.R. at 904; *Curry,* 57 B.R. at 828. DIP's refusal to undertake such avoidance actions is unjustified notwithstanding family or personal conflicts. *Gibson,* 66 F.3d at 1444–45 (*citing In re McKeesport Steel Castings Co.,* 799 F.2d 91, 94 (3rd Cir.1986), and *Louisiana World Exposition,* 858 F.2d at 252–53). The unsecured creditors are left unprotected by the DIP's failure to initiate valid causes of action. *Id.,* 66 F.3d at 1445.

The benefits of the UCC's representation of the estate in the proposed avoidance ac-

tions are clearly apparent. There is no cost or risk of loss to the estate. The UCC confirms in its brief at n.1 that its actions to avoid transfers will not result in an administrative expense to the estate unless it obtains a judgment avoiding the transfers and property is recovered. The estate stands only to benefit from any successful recovery by the UCC, without any risk of loss or diminution of the estate.

Next, BRH contends that the UCC has not shown the existence of actual unsecured creditors at the time of the transfers to maintain an avoidance action under a theory of constructive fraud. The UCC requested and the Court took judicial notice of the Proofs of Claim Nos. 122 and 123, filed by Jerry or Keith DeWeese and by Vandalia Investment Company on February 10, 1998. Both assert general unsecured claims. The DeWeese unsecured claim arose September 30, 1993. The Vandalia unsecured claim arose April 5, 1996. Both arose on or before the April 5, 1996, transfer of 720 residential units from the DIP to the St. Marie Trust.

In addition, Proof of Claim No. 120 filed by Patrick Kelly asserts an unsecured claim in the sum of $184,442.70 which was incurred March 25, 1996. Kelly filed a consent to the UCC's motion on February 17, 1998. The DIP has not objected to any of these unsecured claims. By operation of F.R.B.P. 3001(f) they are *prima facie* evidence of their validity and amount. BRH's contention that the UCC has shown no unsecured creditors as of the date of the transfer is clearly contradicted by the record.

BRH contends that the UCC cannot show actual fraud, and that transfers are not avoidable by means of constructive fraud under § 544(b) under the holding of *Kupetz*. The UCC replies that *Kupetz* construes California law and that the Montana fraudulent conveyance statute, Mont.Code Ann. § 312–333(1), allows a post-transfer creditor to assert that a transfer was fraudulent either actually or constructively. For the purpose of determining whether the UCC has shown colorable claims to proceed with avoidance actions under *Spalding Composites, supra, Gibson, supra,* and cases cited therein, the UCC has made a sufficient showing.

Section 544(b) provides: "The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." The meaning of "applicable law" in this case is clearly Montana law.

The applicable Montana fraudulent transfer statute, § 31–2–333(1) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

Section 31–2–333 was enacted in 1991, three years after the Ninth Circuit's decision in *Kupetz*. Therefore, this Court does not consider *Kupetz* to be controlling law of the circuit as asserted by BRH. In the first place *Kupetz* construed California law, not Montana law. Second, the court in *Kupetz* declined to apply the theory of constructive fraud to a leveraged buyout ("LBO"), where a lender takes a security interest in a company's assets, thereby reducing the assets available to creditors in the event of failure to the business. 845 F.2d at 846–48. The instant case simply does not involve an LBO under the *Kupetz* definition, and thus the court's hesitancy to apply the theory of constructive trusts to an LBO has no application to the transfers shown in Exhibit 2 and 4.

Moreover, even *Kupetz* acknowledges that fraudulent intent can be shown by "badges of fraud". 845 F.2d at 846. Montana law permits actual fraudulent intent to be established by circumstantial evidence, such as by various badges of fraud. *In re Teigen,* 13 Mont. B.R. 143, 146–47 (9th Cir. 1994) (*citing O'Connor v. Lewis,* 238 Mont. 270, 776 P.2d 1228, 1232–33 (1989)). *Kupetz,* then, is authority more in support of the UCC than BRH, because it recognizes that badges of fraud may establish fraudulent intent [4].

## IV. CONCLUSION

The UCC has satisfied its burden of establishing standing to initiate avoidance actions by stipulation with the DIP, by establishing colorable claims against BRH, Terry Parks, and related trusts, that would benefit the estate if successful and which will cost the estate nothing in costs and attorney's fees unless and until the avoidance actions are successful in recovering property. *Gibson; In re Spalding Composites Co., Inc.* The DIP's failure to initiate such avoidance actions are understandable given the DIP's conflicts, but unjustified.

IT IS ORDERED BRH's objections are overruled; and the UCC's motion for authority to avoid transfers, filed January 23, 1998, is granted.

IT IS FURTHER ORDERED the UCC is authorized to pursue avoidance actions with respect to all transfers of real property or equitable interests therein between the DIP and the St. Marie Trust, the AES Trust, and the Valley Park Enterprises Trust; the transfers of real property from the DIP to BRH and Taylor; and the satisfaction of DIP's indebtedness to Terry Parks, all occurring within one year of the bankruptcy petition date.

---

**4.** It is not the Court's purpose to decide the merits of any avoidance actions herein, only to determine whether a colorable claim that would benefit the estate exists based on a cost-benefit analysis. *Gibson,* 66 F.3d at 1446. The UCC is correct that it does not have to satisfy the quantum of proof necessary for a judgment in order to show a colorable claim.